UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

**JOE BALTAS,**                  :
     **Plaintiff,**              :
                           :
     **v.**                      :      **Case No. 3:22-CV-38 (MPS)**
                           :
**ALEXANDER DONES, et al.,**     :
     **Defendants.**

## INITIAL REVIEW ORDER

Plaintiff Joe Baltas, a sentenced inmate housed within the custody of the Connecticut Department of Correction ("DOC"), has filed this action against the State of Connecticut,[1] Assistant State's Attorney ("ASA") Adrienne Russo, and six DOC employees: Officer Alexandro Dones, Officer Gervacio Negron, Officer Yavuz Usluca, Lieutenant William Rodriguez, Correction Officer David Savoie, Correction Officer Olsen, and Security Division Captain Robert Hartnett. Compl., ECF No. 1. The claims in this action were previously asserted in, and severed from, his prior case, *Baltas v. Fitzgerald*, 21cv587 (MPS). *Id.* at ¶ 22. *See* Initial Review Order ("IRO"), ECF No. 27, *Baltas v. Fitzgerald*, 21cv587 (MPS). Baltas claims violations of his rights under the United States Constitution and federal and state statutes, as well as under the state constitution and state common law. He seeks damages, injunctive relief for an investigation referral, and a prejudgment remedy. *Id.*

In his complaint, Baltas asserts Count One against ASA Russo for violation of his rights under the Fourth, Sixth, Eighth and Fourteenth Amendments and federal statutes; Count Two

---

[1] Baltas cannot assert a section 1983 claim against the State of Connecticut, which is not a "person" subject to suit under 42 U.S.C. § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). Baltas has named the State of Connecticut for purposes of his state law claim under Connecticut General Statutes § 52-556 for injury through negligence of a state employee operating a state-owned and -insured vehicle.

against Dones, Negron, Usluca, and Rodriguez for violation of his rights under the First, Fourth, Eighth, and Fourteenth Amendments, civil conspiracy statutes, and federal criminal statutes; Count Three against the State of Connecticut based on the negligent conduct of its employees Dones, Negron, Usluca, and Rodriguez; Count Four against Defendants Hartnett and Rodriguez for violation of his rights under the First, Fourth, Eighth, and Fourteenth Amendments, civil conspiracy statutes, and federal criminal statutes due to their deliberate indifference and failure to supervise; Count Five against Officers Savoie and Olsen for violations of his rights under the First, Fourth, Eighth, and Fourteenth Amendments, civil conspiracy, and violation of federal criminal statutes; Count Six against Captain Hartnett for violation of his rights under the First, Fourth, Eighth, and Fourteenth Amendments, civil conspiracy, and violation of federal criminal statutes based on a failure to protect Baltas from harm by taking steps to deter future abuse, by failing to supervise subordinate staff, and by engaging in a pattern of conspiratorial misconduct; and Count Seven against all defendants for violation of the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 et seq., civil conspiracy statutes, and federal criminal statutes.[2] Compl. at ¶¶ 134-160.

For the following reasons, the Court will permit some of Baltas's claims under the Eighth and First Amendments to proceed beyond initial review.

## I. STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 1915A(b), the court must review prisoner civil complaints against governmental actors and "dismiss ... any portion of [a] complaint [that] is frivolous,

---

[2] In Count Eight, Baltas asserts a cause of action seeking liberal construction of his allegations, which is the standard of review for *pro se* complaints and does not state a distinct cause of action. That count is dismissed.

malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary relief from a defendant who is immune from such relief." *Id.* Rule 8 of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Although detailed allegations are not required, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). A complaint that includes only "'labels and conclusions,' 'a formulaic recitation of the elements of a cause of action' or 'naked assertion[s]' devoid of 'further factual enhancement,'" does not meet the facial plausibility standard. *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)). Although courts still have an obligation to interpret "a *pro se* complaint liberally," the complaint must include sufficient factual allegations to meet the standard of facial plausibility. *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citations omitted).

## II. ALLEGATIONS

For purposes of initial review, the Court considers all of the following allegations to be true.

On June 6, 2018, Baltas was transferred from Garner Correctional Institution to Corrigan-Radgowski Correctional Center ("Corrigan"). Compl. at ¶ 25. While housed at Corrigan, Baltas allegedly suffered numerous civil rights violations that are the subject of a separate action, *Baltas v. Fitzgerald*. *Id.* at ¶ 28.

3

After Baltas filed numerous grievances at Corrigan, Warden Faucher placed him on a "Grievance Restriction" on July 10, 2018. *Id.* at ¶ 29.

On September 6, 2018, Baltas attended a court date for his habeas trial with his counsel, Attorney Frank Cannatelli. *Id.* at ¶ 30. The State was represented by ASA Russo. *Id.* At no time did Baltas express any threats against anyone or interact with anyone except his attorney. *Id.* at ¶ 32. However, ASA Russo argued that Baltas should be kept in restraints during trial. *Id.* at ¶ 31. The court denied her request. *Id.*

On September 7, ASA Russo emailed Attorney Cannatelli stating that she had information that Baltas was planning to engage in violence directed at him. *Id.* at ¶ 33. ASA Russo later contacted DOC and similarly accused Baltas of harboring intent to engage in violence against correctional staff. *Id.*

On September 10, 2018, Baltas was called to the Intelligence Office where he was interviewed by Intelligence Lieutenant Tammaro and Intelligence Administrative Counselor Doran, who informed him that they had received a report that Baltas was planning to assault Lieutenant Fitzgerald. *Id.* at ¶ 36. Baltas denied these assertions and Counselor Supervisor Doran admitted that the allegations against Baltas came under unusual circumstances. *Id.* at ¶ 37. DOC officials determined that the allegations had no merit. *Id.* Baltas was returned to the A-Pod where he interacted with Lieutenant Fitzgerald without incident. *Id.*

On September 11, 2018, Baltas had a legal call with his attorney, who informed him about ASA Russo's email and that such involvement by an ASA was "extremely odd." *Id.* at ¶ 38.

That evening, Baltas was taken to the RHU pending the investigation into the false allegations. *Id.* at ¶ 39.

On September 12, 2018, Counselor Supervisor Doran informed Baltas that the matter had been considered resolved but that the State's Attorney had called the facility administration and expressed displeasure with their failure to act on her report and secure staff safety. *Id.* at ¶ 40. This prompted Baltas's placement in the RHU. *Id.* Baltas alleges that the ASA who contacted DOC was ASA Russo. *Id.* at ¶ 41.

As a result of the false allegations, Baltas was for the first time during his incarceration placed on a heightened security Special Transportation Unit list. *Id.* at ¶ 42.

On September 13, Baltas was brought to the Admitting and Processing ("AP") area for his transport to another hearing at state superior court in Rockville, Connecticut. *Id.* at ¶ 44.

The Special Transportation team (Defendants Negron, Dones, and Usluca) arrived to transport him; Baltas noted that the team of three were wearing full tactical gear and ballistic vests, which was unusual as correctional staff are not generally "decked out for combat." *Id.* at ¶¶ 45-46. Baltas noticed that Officer Dones had a white skull "Punisher" emblem, which is prohibited by DOC Directive 2.13 and signified he was in a semi-secret group of officers who engage in "significant violence" against inmates. *Id.* at ¶¶ 47-48. The team placed Baltas into full restraints, with handcuffs attached to a waist chain attached to a tether chain that connected his ankle shackles to his waist chain ("Chubbs"). *Id.* at ¶ 49. These restraints fully restrain an individual so that any resistance or struggle is impossible. *Id.* Officer Negron asked Baltas whether he liked to assault staff, but Baltas had at that time never assaulted any correctional staff member. *Id.* at ¶ 50. The team escorted him to the transport vehicle in the rear cab, which has no

windows or ventilation. *Id.* at ¶ 51. Officer Usluca secured Baltas's seatbelt as required under

state law and prison regulations. *Id.* at ¶ 52. He was transported to superior court without

incident during the trip of approximately 45 minutes. *Id.* at ¶ 53.

Upon arrival at approximately 10:00 AM, Baltas exited the cab of the truck and

Correction Officers Dones and Negron escorted him, holding onto his arms, although they are

not required to conduct "hands-on" escorts, which are not permitted under prison regulations

unless a prisoner is combative. *Id.* at ¶¶ 54-55. During the escort, Negron pinched Baltas's arm,

which caused him pain. *Id.* at ¶ 56. Baltas asserts that this tactic is used by correctional staff to

invoke a visible response so that the inmate looks as if they are "pulling away." *Id.* Baltas

ignored the pinching and proceeded to the lock-up area of the courthouse where he was silent

and compliant. *Id.* at ¶ 57. The restraints were removed and Baltas was secured in his cell. *Id.*

After his hearing ended favorably, Baltas was returned to his holding cell. *Id.* at ¶ 58. At

that time, he was provided with spoiled juice that he tossed toward the trash bin outside the cell.

*Id.* at ¶ 59. The juice landed on the floor. *Id.*

Officer Negron, Dones, and Usluca returned to the cell escorted by Judicial Marshal

Repoli. *Id.* at ¶ 60. While Baltas was being placed in full restraints by the team, Officer Negron

caused Baltas pain by squeezing, bending and forcefully manipulating Baltas's arms, hands, and

wrists hard enough to leave bruising. *Id.* at ¶ 61. After Baltas complained about pain, Negron

told him that he could do anything he wanted. *Id.*

Baltas was escorted back to the vehicle in the presence of Lieutenant Rodriguez, the

supervisor of the transportation unit. *Id.* at ¶ 62. Correction Officer Usluca and Marshal Repoli

were positioned behind Baltas, while Officers Dones and Negron took Baltas's arms. *Id.* at ¶ 63.

Negron again pinched Baltas's arm so hard that it bruised him and broke his skin. *Id.* at ¶ 64. Baltas asked him to stop, but Negron refused to do so. *Id.* Officers Dones and Negron forced Baltas to walk with steps that extended beyond the length of his shackles, which caused significant pain when the shackles cut into Baltas's flesh. *Id.* at ¶ 65. Baltas asked them to stop hurting him and stopped walking. *Id.* at ¶ 67.

Officers Dones and Negron lifted him off the ground and forced him onto the back of the truck and pressed him forward before Officer Dones grabbed the tether chain hanging between Baltas's legs and pulled it backwards; this caused Baltas's legs to fly out from underneath him and strike his head on the metal bench and floor and to lose consciousness. *Id.* at ¶¶ 68-70.

When he regained consciousness, Baltas was in extreme pain and discovered that Dones and Negron were forcing his legs back onto themselves, while Usluca was pushing him further into the cab; his legs were also being struck. *Id.* at ¶ 71. Lieutenant Rodriguez responded to and observed this incident. *Id.* at ¶ 72. Negron threatened to spray Baltas with mace and Dones encouraged him to spray Baltas, but Negron did not spray Baltas with mace. *Id.* at ¶ 73. Negron, Dones and Usluca left Baltas on his stomach in restraints on the floor of the truck cab without being secured by a seatbelt, while Lieutenant Rodriguez looked on. *Id.* at ¶ 75.

Baltas was then transported while experiencing extreme pain in his head, knees, elbows, wrists, hands, legs, and ankles; blurred vision; and extreme disorientation and nausea. *Id.* at ¶ 76. During the transport, Baltas bounced around in the metal cab without being secured in a seatbelt, which caused Baltas to sustain further injuries. *Id.* at ¶ 78.

When he pleaded for help, the officers laughed, and Negron stated: "This is what happens to inmates who assault staff." *Id.* at ¶ 81. The officers took Baltas for a "rough ride" that

extended the length of the trip from 45 minutes to an hour and a half; during the transport, they turned up the heat in the cab to the maximum and turned on the radio, thereby causing Baltas auditory pain, disorientation, dizziness, nausea, faintness, and exhaustion. *Id.* at ¶¶ 82-83. When they arrived at Corrigan, Officers Negron and Dones told Baltas not to say anything or there would be "hell to pay." *Id.* at ¶ 84.

The officers escorted Baltas into Corrigan at 12:30 PM, and Baltas immediately reported to Officer Muckle that the Special Transportation Team had assaulted him. *Id.* at ¶ 85. After Officer Muckle saw Baltas's face, he requested a supervisor to respond immediately. *Id.* at ¶ 86. While Baltas was secured in the AP area cell, Officer Dones made threatening gestures and intimidating eye contact with Baltas. *Id.* at ¶ 88. He told Baltas to "take it back or we will get at you." *Id.*

Lieutenant Palmer arrived and spoke briefly with staff, including Dones, Negron and Usluca. *Id.* at ¶ 89. Baltas observed Dones remove the "Punisher" emblem patch from his ballistic vest. *Id.* With a hand-held camera present, Palmer took Baltas to the strip search area where he took photographs of Baltas's injuries, including a large knot on the top of Baltas's head, various cuts, abrasions, and contusions on his face, hands, fingers, wrists, elbows, and knees; he then escorted Baltas to the medical unit for assessment. *Id.* at ¶ 90.

Baltas was briefly assessed and placed in a medical cell on an emergency twenty-four-hour concussion watch. *Id.* at ¶ 91. He experienced extreme pain throughout his entire body, some of which lasted for many months. *Id.* at ¶ 92. He provided a quick statement to Palmer, although he was having trouble focusing and articulating the events of the incident due to his head injury. *Id.* at ¶ 93. Corrigan administrators contacted the Connecticut State Police to report

the assault. *Id.* at ¶ 94. A State Trooper responded to Corrigan, and another was dispatched to Rockville. *Id.* When the Trooper asked for a statement, Baltas responded that he had just provided one to DOC. *Id.* The trooper stated that he could "just use that one." *Id.* Lieutenant Rodriguez and Officers Dones, Negron and Usluca met and provided nearly identical false reports of the incident. *Id.* at ¶ 95.

On September 14, Baltas returned to the RHU from his medical cell. *Id.* at ¶ 99. At that time, Correction Officer David Savoie started to harass, torture, intimidate and retaliate against Baltas for reporting his assault by correctional staff to the Connecticut State Police. *Id.* at ¶ 100. He threatened Baltas with physical violence if he did not retract his statement. *Id.* On at least four occasions, Officer Savoie threw objects such as rolls of toilet paper, trash and soap bars at him through his cell trap. *Id.*

On September 15, Correction Officer Olsen commenced his harassment, torture, intimidation, and retaliation against Baltas for his reporting the assault to the Connecticut State Police. *Id.* at ¶ 101. Olsen made multiple threats of violence, including walking up to Baltas's cell with a noose and stating he would make his hanging look like a suicide. *Id.* Olsen also turned off all water in Baltas's cell, thereby depriving Baltas of drinking water or a working toilet. *Id.*

On September 16, Correction Officer Olsen turned Baltas's light on from the control section, which caused Baltas to suffer severe headaches, eye pain, nausea, dizziness and sleep deprivation; he also denied Baltas his dinner and threatened Baltas with violence, indicating that Baltas had "not been fucked up bad enough" and that Baltas would be killed if he made reports to the Connecticut state police. *Id.* at ¶ 103.

On September 17, Lieutenant Cronin returned to work and Baltas reported the retaliatory conduct to him. *Id.* at ¶ 104. Cronin ordered that Baltas's water be turned back on, and he took a statement from another inmate witness. *Id.* Baltas had been without water or sleep for two days. *Id.* at ¶ 105.

On September 19, Baltas was informed that he would be transferred and that he had a separation profile with Lieutenant Fitzgerald, which was based on false allegations asserted by ASA Russo. *Id.* at ¶ 107.

On September 21, Officer Savoie continued to harass Baltas by denying him meals, and throwing a bar of soap at him through the food trap; after Baltas was hit with the soap bar in the face (causing Baltas a cut lip), Officer Savoie stated: "That's for trying to snitch me out." *Id.* at ¶ 108.

From September 22 through 24, Officer Olsen harassed Baltas by denying him food, threatening him, and verbally harassing him. *Id.* at ¶ 109.

On September 24, 2018, Acting Commissioner Monica Rinaldi authorized a security investigation into the September 13 assault on Baltas by Special Transportation Team and into Lieutenant Rodriguez's failure to supervise. *Id.* at ¶ 111. Captain Hartnett was assigned to this investigation. *Id.* at ¶ 112. His investigation showed that Officers Negron, Dones, and Usluca and Lieutenant Rodriguez failed to report an incident and use of force, lied, and falsified reports in violation of prison regulation; failed to secure Baltas with a seatbelt in accordance with prison regulations; altered their uniforms in violation of prison regulations; and that the officers had pulled Baltas's legs from underneath him, which Captain Hartnett opined was appropriate. *Id.* at ¶ 113. Captain Hartnett assisted with the cover up of correctional staff misconduct and conspired

with other officers by amending the directives so that there could not be a finding of a violation. *Id.* at ¶ 119.

On January 7, 2019, Captain Hartnett concluded his investigation with the finding that there was no excessive force but that staff did not buckle Baltas in and had failed to timely report the incidents and use of force. *Id.* at ¶ 120. These findings were accepted by Acting Commissioner Ceplak, who placed separation profiles between Baltas and "the offending staff." *Id.* at ¶ 121. Captain Hartnett also met with the ASA and allegedly conspired with the ASA to refuse to prosecute the offending correctional staff, although the State's Attorney's offices had previously been instructed to prosecute such incidents. *Id.* at ¶ 122.

The incident and results regarding Baltas were distributed department wide. *Id.* at ¶ 124. Baltas asserts that this distribution placed all correctional staff on notice that they could assault him without repercussion and that they could engage in assaults and misconduct that would be covered up by the Security Division investigators. *Id.* As a result of his failure to supervise staff and impose discipline, Captain Hartnett has allegedly created a systemic pattern of corruption in which abuse by correctional staff is authorized and sanctioned. *Id.* at ¶¶ 123-125, 128. Baltas has allegedly suffered numerous abuses from correctional staff who know that they can act with impunity. *Id.* at ¶ 126.

Baltas's grievances relevant to the alleged incident were denied and rejected. *Id.* at ¶ 127.

On September 27, 2018 Baltas was transferred to Cheshire Correctional Institution, where he was placed in the general population and housed without incident until November 8, 2018, when he was transferred involuntarily to Massachusetts. *Id.* at ¶ 110.

On January 19 and 22, 2019, Baltas and Attorney Cannatelli served a Notice of Intent to bring an action against Officers Dones, Negron, Usluca, Rodriguez and Hartnett and the State of Connecticut (and the relevant insurance provider) under Connecticut General Statutes §§ 52-556. *Id.* at ¶ 130.

## III.   DISCUSSION

The Court first considers whether Baltas has alleged any plausible violations of federal law under 42 U.S.C. § 1983.

### A.   Claims under Federal Criminal Statutes

Baltas asserts several claims under federal criminal statutes. Specifically, he asserts violation of 18 U.S.C. §§ 241 (conspiracy against rights), 242 (deprivation of rights under color of law), 371 (conspiracy to commit offense or to defraud the United States), and 1519 (destruction, alteration, or falsification of records). These statutes, however, are federal criminal statutes that do not provide a private right of action. *Murat Ates v. United States*, 2020 WL 6202672 (E.D.N.Y. Oct. 22, 2020) ("Plaintiff asserts claims pursuant to 18 U.S.C. §§ 241, 245, and 249[ ]. However, these are criminal statutes and do not provide a private right of action.") (collecting cases); *Sheehy v. Brown,* 335 F. App'x 102, 104 (2d Cir. 2009) ("To the extent that Appellants assert claims based on the violation of federal criminal statutes, such as 18 U.S.C. §§ 241-242, these claims are not cognizable, as federal criminal statutes do not provide private causes of action."); *Horn v. Brennen*, 840 F. Supp. 2d 576, 582 (E.D.N.Y. 2011) (criminal conspiracy under 18 U.S.C. § 371 does not provide for a private cause of action); *Hardy-Graham v. Southampton Just. Ct.*, No. 20-CV-0981(JS)(SIL), 2021 WL 260102, at *3 (E.D.N.Y. Jan. 25, 2021) (Section 1519 does not provide for private right of action) (*citing Kalola v. Int'l Bus.*

*Machines Corp.*, No. 19-CV-9900, 2019 WL 6879307, at *3 (S.D.N.Y. Dec. 16, 2019)). Such claims of violations of federal criminal statutes must be dismissed as not plausible.

### B.      Civil Conspiracy and Section 1985 Claims

Baltas asserts conspiracy claims under 42 U.S.C. §§ 1983 and 1985. Section 1985 has three subsections. Section 1985(1) relates to conspiracies to prevent federal officials from performing their duties and has no relevance to the facts of this case. Sections 1985(2) and 1985(3) provide causes of action based on conspiracies intending to violate a plaintiff's civil rights. *Mills v. Noonan*, No. 1:16-CV-00984-MAT, 2017 WL 1353479, at *10 (W.D.N.Y. Apr. 13, 2017).[3]

To the extent Baltas alleges civil conspiracy claims under sections 1983 and 1985, he has not alleged a plausible conspiracy. To state a viable conspiracy claim, a plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2013) (internal quotation marks and citations omitted). Although Baltas alleges numerous violations of his rights, his complaint contains no factual allegations indicating that there was a meeting of the minds or that defendants conspired to violate Baltas's constitutional rights. *See Storck v. Suffolk Cnty. Dep't of Soc. Servs.*, 62 F. Supp. 2d 927, 940 (E.D.N.Y. 1999) (noting conspiracy allegations can be neither vague nor conclusory, but must "allege with at least some degree of particularity overt acts which defendants engaged in which were reasonably

---

[3] Section 1985(2) concerns conspiracies intending to deter "any party or witness" from participating in state or federal proceedings or to obstruct justice with intent to deny equal protection of the law; and 1985(3) applies to conspiracies to deprive a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws, and precedent makes clear that the conspiracy must be motivated by a "racial, or perhaps otherwise class-based invidiously discriminatory animus." *See Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971); *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015).

related to the promotion of the alleged conspiracy."); *Ciambriello v. County of Nassau*, 292 F.3d

307, 325 (2d Cir. 2002) ("[C]onclusory, vague, or general allegations that the defendants have

engaged in a conspiracy to deprive the plaintiff of his constitutional rights" are insufficient.).

Baltas has not alleged any facts that suggest that the defendants had a meeting of the minds or

conspired to deter participation in a court proceeding or to obstruct justice in violation

of Section 1985(2). Nor has he alleged that Defendants were acting in furtherance of a

conspiracy motivated by racial or other unlawful discrimination in violation of Section 1985(3).

　　　To the extent Baltas claims a conspiracy between DOC employees, Baltas's conspiracy

claims are also barred under the doctrine of intracorporate conspiracy. Under the doctrine

of intracorporate conspiracy, "officers, agents and employees of a single corporate or municipal

entity are legally incapable of conspiring together." Thus, they cannot be liable for

conspiracy. *Blue v. City of New York*, No. 16-CV-9990(VSB), 2018 WL 2561023, at *9

(S.D.N.Y. June 4, 2018) (citing *Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008) (affirming

application of intracorporate conspiracy doctrine in conspiracy claim under 42

U.S.C. § 1985(3))). An exception to the doctrine permits conspiracy claims against "individuals

within a single entity when they are pursuing personal interests wholly separate and apart from

the entity." *Bond v. Bd. of Educ. of the City of N.Y.,* No. 97–CV–1337, 1999 WL 151702, at *2

(E.D.N.Y. Mar. 17, 1999). A mere allegation that the defendants had personal bias against the

plaintiff, however, is insufficient to satisfy the exception. *See Vega v. Artus*, 610 F. Supp. 2d

185, 205 (N.D.N.Y. 2009) (holding that prisoner must do more than allege that defendants were

motivated by personal bias against him to show that defendants were pursuing personal interests

wholly separate and apart from the entity). In order for the exception to apply, a plaintiff must

14

allege that the defendants acted other than in the normal course of their corporate duties. *Girard v. 94th St. & Fifth Ave. Corp.,* 530 F.2d 66,72 (2d Cir. 1976) (internal quotations marks and citation omitted). Baltas has not alleged facts suggesting that Defendants were acting other than in the course of their duties. Thus, the exception does not apply, and Baltas's civil conspiracy claims may be dismissed under the intracorporate conspiracy doctrine. *See Baltas v. Rivera*, No. 3:19-CV-1043 (MPS), 2019 WL 3944435, at *10 (D. Conn. Aug. 21, 2019) (dismissing section 1983 conspiracy claims).

As for any claim under section 1986, it necessarily fails because a violation of section 1986 may proceed only if a plaintiff is able to establish a predicate claim under § 1985.[4] *See Brown v. City of Oneonta, New York*, 221 F.3d 329, 341 (2d Cir. 2000). Accordingly, these claims must be dismissed.[5]

### C.    RICO

In his seventh cause of action, Baltas asserts a violation of "Federal RICO laws" due to "a systemic pattern of criminal and corrupt conduct, inclusive of patterns of abuse, violence,

---

[4] Section 1986 provides a cause of action against anyone who "having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of same, neglects or refuses so to do...." 42 U.S.C. § 1986.

[5] To the extent that Baltas asserts a cause of action for damages under section 1988, such a claim is not plausible. Section 1988(a) provides only that district courts shall exercise their jurisdiction over civil rights cases in conformity with federal law or state law and does not provide an independent cause of action. *Moor v. Alameda Cty.*, 411 U.S. 693, 702-06 (1973). Section 1988(b) and (c) address a district court's authority to award attorneys' fees and expert fees in actions brought under section 1988. 42 U.S.C. § 1988(b)-(c). Because Baltas is proceeding *pro se* and is therefore not entitled to attorneys' fees, those sections are inapplicable here. *See Kay v. Ehrler*, 499 U.S. 432, 435 (1991) (noting a *pro se* litigant who is not a lawyer is not entitled to attorney's fees); *see also Sosa v. Lantz*, 660 F. Supp. 2d 283, 289 (D. Conn. 2009). Accordingly, any claims raised under section 1988 are dismissed as not plausible.

fraud, falsification of state records and fabrication of records, and wide spread systemic cover ups and frauds." Compl. at ¶ 155.

Congress enacted RICO to address the unlawful activities of those individuals involved in organized crime in the United States. *See Att'y Gen. of Can. v. R.J. Reynolds Tobacco Holdings, Inc.,* 268 F.3d 103, 107 (2d Cir. 2001) ("RICO is a broadly worded statute that has as its purpose the elimination of the infiltration of organized crime and racketeering into legitimate organizations operating in interstate commerce.") (internal quotation marks omitted). RICO is directed at "'racketeering activity,' which i[s] define[d] as any act 'chargeable' under several generically described state criminal laws, any act 'indictable' under numerous specific federal criminal provisions, and any 'offense' involving bankruptcy or securities fraud or drug-related activities that is 'punishable' under federal law." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 482-83 (1985) (quoting 18 U.S.C. § 1961(1)).

"To state a claim for damages under RICO, a plaintiff has two pleading burdens." *Town of W. Hartford v. Operation Rescue*, 915 F.2d 92, 100 (2d Cir. 1990) (quotation and citation omitted). First, he must allege that a defendant violated 18 U.S.C. § 1962. *Id.* Thus, a plaintiff must allege "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Id.* Second, a plaintiff must also allege that he was "'injured in his business or property by reason of a violation of section 1962.'" *Id.* (quoting 18 U.S.C. § 1964(c)); *Sentementes v. Town of Bethel*, No. 3:20CV580 (MPS), 2020 WL 5994950, at *12 (D. Conn. Oct. 9, 2020).

Baltas makes a conclusory assertion that Defendants have violated the RICO statute, but his factual allegations fail to plausibly allege the elements of a civil RICO violation. He has not alleged facts reflecting that Defendants have engaged in a pattern of racketeering activity; even if he has, Baltas has not alleged facts reflecting that a violation of section 1962 has injured him "in his business or property." Accordingly, Baltas's claims under RICO must be dismissed as not plausible.

**D.    Fourth Amendment[6]**

The Fourth Amendment provides in pertinent part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. Const. amend. IV. However, the Supreme Court has held that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell" because "[t]he recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." *Hudson v. Palmer*, 468 U.S. 517, 526-30 (1984). Nor is the Fourth Amendment applicable to seizures of inmate property by prison officials. *See id.* at 528 n.8 ("the same reasons that lead us to conclude that the Fourth Amendment's proscription against unreasonable searches is inapplicable in a prison cell, apply with controlling force to seizures"). The Fourth Amendment provides protection against unreasonable intrusion into an inmate's right to bodily privacy. *See Harris v. Miller,* 818 F.3d 49, 57-58 (2d Cir. 2016) (citing *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)). Baltas has not alleged any conduct by a defendant that suggests an

---

[6] The Fourth Amendment generally applies to the period prior to arraignment when the inmate is in police custody. *See Powell v. Gardner*, 891 F.2d 1039, 1044 (2d Cir. 1989) (Fourth Amendment applies through time of arraignment or formal charge).

unreasonable intrusion into his bodily privacy. Thus, any Fourth Amendment claim is dismissed as not plausible.

    **E.**    **Sixth Amendment**

The Sixth Amendment is only applicable to criminal prosecutions. *Gilliam v. Black*, No. 3:18-cv-1740 (SRU), 2019 WL 3716545, at *6 (D. Conn. Aug. 7, 2019) (stating that the Sixth Amendment applies only to criminal prosecutions). In the specific context of a criminal defendant inmate's access to counsel, the Second Circuit has concluded that a restriction on a criminal defendant's contact with his or her attorney is "unconstitutional where the restriction unreasonably burdened the inmate's opportunity to consult with his [or her] attorney and to prepare his defense." *Benjamin v. Fraser,* 264 F.3d 175, 187 (2d Cir. 2001) (quotation and citation omitted). To establish a Sixth Amendment violation based on Government interference with the attorney-client relationship, a defendant must demonstrate that "privileged information was passed to the government or that the government ... intentionally invaded the attorney client relationship, and resulting prejudice." *United States v. Ginsberg*, 758 F.2d 823, 833 (2d Cir. 1985) (citations and alterations in original omitted).

Baltas has asserted a violation of his Sixth Amendment rights based on ASA Russo's allegedly false assertion that Baltas intended to direct violence against his habeas attorney (Attorney Cannatelli) and correctional staff. Compl. at ¶¶ 134. However, there is "no constitutional right to an attorney in state post-conviction proceedings" where such proceedings are not the first appeal as of right. *Coleman v. Thompson,* 501 U.S. 722, 752 (1991). Consequently, Baltas cannot claim a violation of his Sixth Amendment right based on the unspecified alleged interference with his attorney-client relationship with Attorney Cannatelli.

The Court can discern no factual allegations giving rise to any Sixth Amendment claims in Baltas's complaint. Accordingly, Baltas's claims under the Sixth Amendment against Defendant ASA Russo or any other defendant are dismissed as not plausible.[7]

### F.   Eighth Amendment

The Court construes Baltas's complaint as asserting Eighth Amendment claims based on excessive force, conditions of confinement, failure to protect, and verbal harassment. As a sentenced inmate, the plaintiff's claims are cognizable under the Eighth Amendment, not the Fourth or Fourteenth Amendments. *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (deliberate indifference claims of sentenced inmates are considered under the Eighth Amendment while claims of pretrial detainees are considered under the Fourteenth Amendment); *Powell v. Gardner*, 891 F.2d 1039, 1044 (2d Cir. 1989) (applying Fourth Amendment to period prior to arraignment while inmate is in police custody).

### 1.   Excessive Force

When an inmate alleges use of excessive force by a correctional officer, the issue is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7

---

[7] To the extent that Baltas asserts that any interference with his attorney-client relationship with Attorney Cannatelli violated his constitutional right of access to the courts, such a claim is not plausible based on the allegations of the complaint. *See Lewis v. Casey*, 518 U.S. 343, 350 (1996); *Miller v. Semple*, 2019 WL 6307535, at *4 (D. Conn. 2019) ("Prisoners have a constitutional right of access to the courts that may not be unreasonably obstructed by the actions of prison officials."). To state a claim for denial of access to the courts, a plaintiff must demonstrate that he suffered an actual injury, *see Lewis*, 518 U.S. at 351-53—that is, he must allege that "defendant's conduct deprived him of an opportunity to press some nonfrivolous, arguable cause of action in court," *Baker v. Weir*, 2016 WL 7441064, at *2 (D. Conn. 2016) (quoting *Brown v. Choinski*, 2011 WL 1106232, at *5 (D. Conn. 2011)). Here, Baltas's complaint raises no inference that he had a nonfrivolous legal claim that was frustrated or impeded by any of the named defendants' conduct.

(1992). A *de minimis* use of force will rarely be sufficient to satisfy the objective element unless that force is also "repugnant to the conscience of mankind." *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) (quoting *Hudson*, 503 U.S. at 9-10 (internal quotation marks omitted)). The extent of the inmate's injuries as a result of the defendant's conduct is not the critical issue in determining the objective component. *See Wilkins,* 559 U.S. at 37 ("core judicial inquiry" is "not whether a certain quantum of injury was sustained," but rather whether unreasonable force was applied given the circumstances); *Hudson*, 503 U.S. at 9 ("[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated" irrespective of whether significant injury is present). The court considers factors including "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Id.* at 7 (internal quotations and citation omitted).

Officers are liable not only when they use excessive force themselves, but also when they fail to intervene to stop the excessive use of force by another officer when in a position to observe the conduct and with time to intervene. *See Sloley v. VanBramer*, 945 F.3d 30, 46-47 (2d Cir. 2019). "Liability attaches on the theory that the officer, by failing to intervene, becomes a 'tacit collaborator' in the illegality." *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016)

Baltas alleges that he was placed in the extremely restrictive restraints during his transport, although he was never previously on the heightened security Special Transportation list and had never assaulted staff. Compl. at ¶¶ 43, 49, 50. A prison official's decision to place an inmate in restraints in an effort to "maintain[] prison security, without more, does not violate the Eighth Amendment." *Alston v. Butkiewicus*, No. 3:09-CV-207 CSH, 2012 WL 6093887, at *11

(D. Conn. Dec. 7, 2012). Because Baltas's allegations suggest that he was placed in extremely restrictive restraints without any need to maintain prison security, the Court will permit an Eighth Amendment claim to proceed against Officers Done, Negron, and Usluca for placing him in heightened security restraints.

The Court will also permit Baltas to proceed on his Eighth Amendment claim based on the alleged conduct by Negron aimed at causing him pain during his escorts while restrained, and his treatment by Negron, Dones, and Usluca in placing him in the vehicle. *See* Compl. at ¶¶ 56, 64, 67-76.

These excessive force claims may also proceed against Lieutenant Rodriguez for a failure to intervene to prevent any alleged misuse of force related to the use of restraints or treatment of Baltas. *Id.* at ¶¶ 72, 77.

To the extent Baltas asserts an excessive force claim against Officer Savoie for throwing objects such as soap, toilet paper and trash at him, such allegations only raise an inference that Officer Savoie subjected Baltas to a *de minimis* use of force that may be objectionable but is not "repugnant to the conscience of mankind." *Wilkins*, 559 U.S. at 38.

Thus, Baltas may proceed on his Eighth Amendment excessive force individual capacity claims against Officers Negron, Dones, and Usluca and Lieutenant Rodriguez. Baltas's allegations raise no other plausible claims of excessive force in violation of the Eighth Amendment.

### 2.      Deliberate Indifference to Safety and Health/Conditions of Confinement

Baltas alleges that Defendants Negron, Dones, and Usluca failed to secure him in a seatbelt in the transport vehicle while he was in restraints and ignored his cries for help as his

21

body bounced around the cab while in restraints. Compl. at ¶¶ 75-82. He alleges that Lieutenant Rodriguez was aware of how he had been placed in the vehicle but failed to secure him or check on his well-being. *Id.* at ¶¶ 77-80. He represents that Defendants Negron, Dones, and Usluca subjected him to sensory torture during the transport by turning up the heat and radio, driving erratically, and taking a longer route than usual. *Id.* at ¶ 82.

The Eighth Amendment requires prison officials to "take reasonable measures to guarantee the safety of inmates in their custody[.]" *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994) (internal quotation marks and citations omitted). Prison conditions that "involve the wanton and unnecessary infliction of pain" constitute cruel and unusual punishment under "the Eighth Amendment, which is applicable to the States through the Fourteenth Amendment." *Rhodes v. Chapman*, 452 U.S. 337, 344-46 (1981) (internal quotation marks and citation omitted). Conditions of confinement that are merely "restrictive or even harsh," however, do not violate the Eighth Amendment because "they are part of the penalty that criminal offenders pay for their offenses against society."  *Id.* at 347.

To state a claim of deliberate indifference to health or safety due to unconstitutional conditions of confinement, an inmate is required to demonstrate an objective and a subjective element. To meet the objective element, the inmate must allege that he was incarcerated under a condition or a combination of conditions that resulted in a "sufficiently serious" deprivation of a life necessity or a "human need[ ]" or posed "a substantial risk of serious harm" to his health or safety. *Farmer*, 511 U.S. at 834; *Rhodes*, 452 U.S. at 347. The Supreme Court has identified the following basic human needs or life necessities of an inmate: food, clothing, shelter, medical care, warmth, safety, sanitary living conditions, and exercise. *See Wilson v. Seiter*, 501 U.S. 294,

304 (1991); *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989); *Rhodes,* 452 U.S. at 348.

To meet the subjective element, an inmate must allege that the defendants possessed culpable intent; that is, the defendants knew that he faced a substantial risk to his health or safety and disregarded that risk by failing to take corrective action. *See Farmer*, 511 U.S. at 834, 837. Thus, the defendants "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference."   *Id.* at 837. An allegation of "mere negligen[t]" conduct is insufficient. *Id.* at 835. Rather, the subjective element requires that the inmate allege that the defendants acted with the mental state equivalent to "subjective recklessness" as that term is used in "criminal law." *Id.* at 840-41.

**Transport Conditions**

Baltas has sufficiently alleged that Officers Negron, Dones, and Usluca and Lieutenant Rodriguez subjected him to an unreasonable risk of serious harm to his health and safety by taking him for a "rough ride" in the transport van without proper seat belting so that Baltas bounced around in the metal van, and also subjected him to excessive heat and noise. *See* Compl. at ¶ 78-83.[8] Baltas has also asserted facts indicating that Lieutenant Rodriguez and Officers Negron, Dones, and Usluca were aware that he was experiencing difficulty during the ride but failed to take any steps to ensure his safety. *Id.* at ¶ 79. Thus, the Court will permit a deliberate indifference to health and/or safety claim to proceed against Officers Negron, Dones, and Usluca

---

[8] On this initial review, the Court considers that the combination of conditions during Baltas's transport posed an objectively serious risk of harm to Baltas. The Court recognizes that "the failure to provide a seatbelt is not, in itself [a] sufficiently serious" deprivation to meet the objective prong of the Eighth Amendment standard because a seatbelt "is not a life[ ] necessity." *Jabbar v. Fischer,* 683 F.3d 54, 58 (2d Cir. 2012).

and Lieutenant Rodriguez in their individual capacities.

**Water, Food, and Light**

Baltas alleges that Defendant Olsen deprived him of water in his cell and subjected him to cell light causing sleep deprivation for two days and that both Defendants Olsen and Savoie deprived him of meals. Compl. at ¶ 100-103, 105, 108

Baltas may proceed against Olsen and Savoie for subjecting him to a substantial risk of harm by failing to provide him food and drinking water. *See Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) ("prisoners are entitled to nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.") (citation omitted).

He may also proceed on an Eighth Amendment claim against Olsen for subjecting him to a substantial risk of harm by cutting off all of his water for sanitary purposes and subjecting him to cell light causing him sleep deprivation for two days. *See Walker v. Schult*, 717 F.3d 119, 127 (2d Cir. 2013) (Unsanitary conditions and deprivations of access to facilities to maintain hygiene can give rise to Eighth violations); *Booker v. Maly*, No. 9:12–CV–246 (NAM/ATB), 2014 WL 1289579, at *18–19 (N.D.N.Y. Mar. 31, 2014) (noting Eighth Amendment claim based on continuous lighting "turn[s] on the degree of illumination, the duration of the inmate's exposure, the extent of harm it causes, and the penological justification for the lighting.").

**Isolation**

The Court construes Baltas's complaint as asserting a claim based on his isolation and solitary confinement in the RHU. An indefinite isolation with no opportunity for social contact and interaction, no programs, and limitations on telephone and visitation may raise a plausible

Eighth Amendment claim. *See Campbell v. Maldanado*, 2020 WL 2558228, at *4 (D. Conn. May 19, 2020). In this action, Baltas has not alleged factual allegations suggesting that he was subjected to indefinite isolation of a constitutional dimension in the RHU. Accordingly, the Court will dismiss any Eighth Amendment claims based on isolation/solitary confinement.

**Verbal Harassment**

Baltas alleges that Defendants Dones, Olsen and Savoie subjected him to verbal harassment. Compl. at ¶¶ 88, 100, 101, 103, 109.

The Second Circuit has held that verbal harassment by a prison official does not constitute a violation of the Eighth Amendment. *See, e.g.*, *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) (upholding district court's determination that name-calling without appreciable injury not constitutional injury); *Cane v. New Britain Police Dep't*, No. 3:16-CV-1638 (SRU), 2017 WL 752278, at *3 (D. Conn. Feb. 27, 2017) ("Verbal harassment or profanity alone, 'unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem,' does not constitute the violation of any federally protected right and therefore is not actionable under section 1983.") (quoting *Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 474 (S.D.N.Y. 1998)). Accordingly, Baltas's claims against Dones, Olsen and Savoie for verbal harassment that did not expose him to a substantial risk of harm are not plausible.

G.    **Fourteenth Amendment**

Baltas's complaint asserts Fourteenth Amendment violations. Thus, the Court considers whether he has raised any claims of due process or equal protection violation.[9]

---

[9]  To the extent that Baltas asserts his substantive due process rights have been violated, Baltas has not alleged sufficient facts to raise such claim. "The doctrine of substantive due process protects the individual against certain government actions regardless of the fairness of the procedures used to implement them," *McClary v. O'Hare*, 786 F.2d 83, 88 (2d Cir. 1986) (internal quotation marks and

### 1. Procedural Due Process

The Court must analyze a claim for a violation of procedural due process by (1) asking whether there exists a liberty or property interest of which a person has been deprived, and (2) if so, whether the procedures followed by the State in making that deprivation were constitutionally sufficient. *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011). In the prison context, which involves persons whose liberty interests have already been severely restricted because of their confinement, a prisoner cannot show a cognizable deprivation of "liberty" unless he can show that he was subjected to an "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). In that analysis, courts must examine the actual punishment that an inmate received, as well as the conditions and duration of the punishment. *See Davis v. Barrett*, 576 F.3d 129, 133–34 (2d Cir. 2009); *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004).

"[T]he duration of [segregated] confinement is a distinct factor bearing on atypicality and must be carefully considered." *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir. 2000). There is no "bright line rule that a certain period of [segregated] confinement automatically fails to implicate due process rights." *Palmer*, 364 F.3d at 64. Generally, a long period of segregation—such as

---

citations omitted), but the scope of the doctrine "is very limited," *Doe v. U.S. Merchant Marine Acad.*, 307 F. Supp. 3d 121, 156 (E.D.N.Y. 2018). A successful substantive due process claim requires that the plaintiff show "that the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 431 (2d Cir. 2009) (internal quotation marks and citations omitted). Baltas has not alleged any conduct so egregious as to be conscience-shocking conduct that is not already covered under the Eighth or First Amendment. *See Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 842 (1998) (quotation marks omitted) ("where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing [the] claims.").

one longer than 305 days—"is sufficiently atypical to trigger due process protections." *Ellerbe v. Jasion*, 2015 WL 1064739, at *5 (D. Conn. Mar. 11, 2015). "Where the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer*, 364 F.3d at 64–65 (cleaned up). "[R]estrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection, and thus require proof of conditions more onerous than usual." *Davis,* 576 F.3d at 133; *Kalwasinski v. Morse*, 201 F.3d 103, 107–08 (2d Cir. 1999) (discussing factors relevant to deciding if confinement in SHU constitutes an atypical hardship).

When evaluating the processes used in prison disciplinary and administrative decision making, courts must be "mindful of the context," and remember "the deference [courts] owe prison officials in carrying out their daily tasks." *Proctor v. LeClaire*, 846 F.3d 597, 608–09 (2d Cir. 2017) (citing *Bell v. Wolfish*, 441 U.S. 520, 547–48 (1979)). The level of procedural protection that the Constitution requires varies depending on the type of confinement. *See Bolden v. Alston*, 810 F.2d 353, 357 (2d Cir. 1987). For an administrative confinement, the inmate is entitled only to "some notice of the charges against him and an opportunity to present his views [either orally or in writing] to the prison official charged with deciding" the matter. *Hewitt v. Helms*, 459 U.S. 460, 476 (1983). Those procedural steps "must occur within a reasonable time following an inmate's transfer" into administrative confinement. *See id.* at 476 n.8; *see also Taylor v. Comm'r of New York City Dep't of Corr.*, 317 F. App'x 80, 82 (2d Cir. 2009).

For a disciplinary confinement, "an inmate is entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and

present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing *Wolff v. McDonnell*, 418 U.S. 539, 563–67 (1974)). Further, "due process requires that there be some evidence to support the findings made in the disciplinary hearing." *Zavaro v. Coughlin*, 970 F.2d 1148, 1152 (2d Cir. 1992) (quoting *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)) (cleaned up). That standard, however, "is extremely tolerant" and can be satisfied based on "*any* evidence in the record" supporting the disciplinary ruling. *Girard v. Chuttey*, 826 F. App'x 41, 46 (2d Cir. 2020) (quoting *Sira*, 380 F.3d at 69) (cleaned up).

Baltas's allegations indicate that he was placed in the RHU on September 11, 2018 based on a false accusation of planning violence against his attorney and correctional staff. Compl. at ¶ 39. Baltas does not, however, appear to have alleged such a claim against any individual defendant named in this action. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'") (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).

Further, Baltas alleges that he was transferred to the general population at Cheshire on September 27, 2018 (Comp. at ¶ 110), which indicates that he remained in the RHU for a period of 16 days. A brief confinement in restrictive housing is not generally considered an atypical and significant hardship. *See Palmer*, 364 F.3d at 66 (noting the Second Circuit has "affirmed the dismissal of due process claims only in cases where the period of time spent in [restrictive housing] was exceedingly short—less than the 30 days that the *Sandin* plaintiff spent in

[restrictive housing]—and there was no indication that the plaintiff endured unusual [restrictive housing] conditions); *Baldwin v. Arnone*, No. 3:12-cv-243(JCH), 2013 WL 628660, at *3, 8 (D. Conn. Feb. 19, 2013) (holding sanctions of fifteen-day confinement in punitive segregation followed by thirty-day loss of recreation and ninety-day loss of telephone privileges insufficient to demonstrate atypical and significant hardship to support due process claim under *Sandin*) (citing cases).

In addition, Baltas's allegations indicate that he was provided notice of the reason for his administrative placement, but he has not alleged further information with regard to the process of his RHU placement. For all of these reasons, Baltas has not plausibly alleged a denial of the procedures accorded under *Hewitt* for a restrictive administrative confinement.

With respect to being falsely accused of planning to direct violence against his attorney and correctional staff, a false accusation or report is not sufficient to state a claim of a due process deprivation. *See Velez v. Burge*, 483 F. App'x 626, 628 (2d Cir. 2012) (summary order) (noting that an inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest) (citations omitted). Accordingly, Baltas has not alleged any plausible procedural due process claims.

### 2.    Equal Protection

The Equal Protection Clause requires that the government treat all similarly situated people alike. *Harlen Assocs. v. Inc. Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). To state an equal protection claim, a plaintiff must allege facts showing that: (1) he was treated differently from similarly situated individuals and (2) that the selective treatment was motivated

by an intention to discriminate on the basis of "impermissible considerations such as race,

religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith

intent to injure a person." *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000)

(citations omitted).

When a suspect classification is not at issue, the equal protection guarantee still "extends

to individuals who allege no specific class membership but are nonetheless subjected to

invidious discrimination at the hands of government officials." *Williams v. Novoa*, No. 19-CV-

11545 (PMH), 2021 WL 431445, at *9 (S.D.N.Y. Feb. 5, 2021); *see also Fortress Bible Church

v. Feiner,* 694 F.3d 208, 222 (2d Cir. 2012). In such cases, a plaintiff may proceed with an equal

protection claim under a theory of non-class based selective enforcement or a "class of one." *Hu

v. City of New York*, 927 F.3d 81, 93 (2d Cir. 2019) (noting selective enforcement and "class of

one" provide distinct pathways for non-class based equal protection claims). A plaintiff may

bring a "class of one" equal protection claim by alleging that he or she "has been intentionally

treated differently from others similarly situated and that there is no rational basis for the

difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

For either a non-class based selective enforcement or a class of one claim, the plaintiff

must allege he was treated differently than a comparator. *Hu*, 927 F.3d at 93 (2d Cir. 2019)

("both types of Equal Protection claims require a showing that the plaintiff was treated

differently from another similarly situated comparator"). However, a selective enforcement claim

only requires a plaintiff to show that a comparator of a "reasonably close resemblance" was

treated differently. *Id.* (noting that malice-based selective enforcement claims require only a

"reasonably close resemblance" between a plaintiff and comparator). Here, Baltas alleges no

facts suggesting that he has been treated differently than any plausible comparator. Thus, any asserted equal protection claim must be dismissed as not plausible.

### H.    First Amendment Retaliation

Baltas's allegations indicate that Defendants Dones, Savoie, and Olsen retaliated against him for reporting his assault during his transport. Compl. at ¶¶ 88, 100-106, 108-109.

Courts "'approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.'" *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (quoting *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir. 2003)). Retaliation claims "stated in wholly conclusory terms" are insufficient. *Id.* (internal quotation marks and citations omitted). To plead a First Amendment retaliation claim, an inmate must plausibly allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dolan*, 794 F.3d at 294 (internal quotation marks and citation omitted). Protected speech or activity includes filing a lawsuit, an administrative complaint, or a prison grievance. *See id.* at 294 ("It is well established that retaliation against a prisoner for pursuing a grievance violates the right to petition [the] government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.") (internal quotation marks and citations omitted); *Booth v. Comm'r of Corr.*, No. 19-CV-100 (MPS), 2019 WL 919580, at *5 (D. Conn. Feb. 25, 2019) ("Filing complaints and grievances is protected activity.") (citation omitted).

"An adverse action is defined as 'retaliatory conduct that would deter a similarly situated

individual of ordinary firmness from exercising his or her constitutional rights.'" *Brandon*, 938

F.3d at 40 (quoting *Davis*, 320 F.3d at 353). In order to allege causation, the inmate must state

facts "suggesting that the protected conduct was a substantial or motivating factor in the

[defendant's] decision to take action against [him]." *Moore v. Peters*, 92 F. Supp. 3d 109, 121

(W.D.N.Y. 2015) (quoting *Burton v. Lynch*, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009)).

 With respect to Officer Dones, Baltas alleges that Officer Dones made threatening

gestures and repeatedly made statements such as "take it back or we will get at you." Compl. at ¶

88. Verbal threats may constitute adverse conduct if the threats are sufficiently specific and

direct. *See, e.g.*, *Ford v. Palmer*, 539 F. App'x 5, 6 (2d Cir. 2013) (summary order) (finding that

a verbal threat constituted adverse action where a corrections officer threatened to poison the

plaintiff in retaliation for filing grievances); *Quezada v. Roy*, No. 14 CIV. 4056 CM, 2015 WL

5970355, at *21–23 (S.D.N.Y. Oct. 13, 2015) ("The line between de minimis verbal harassment

and retaliatory adverse action ... hinge[s] on the specificity and seriousness of the words used;

'The less direct and specific a threat, the less likely it will deter an inmate from exercising

his First Amendment rights.'")(quoting *Mateo v. Fischer,* 682 F.Supp.2d 423, 434 (S.D.N.Y.

2010) (collecting cases)). For purposes of initial review, the Court will permit Baltas to proceed

on a claim of First Amendment retaliation against Officer Dones.

 Baltas has sufficiently pleaded that Officers Savoie and Olsen took retaliatory action

against him by cutting off his cell water, denying him meals, throwing objects at him, harassing

him verbally, and interfering with his ability to sleep by keeping the lights on in his cell. Thus,

Baltas may proceed beyond this initial review on his First Amendment retaliation claims against

Defendants Dones, Savoie, and Olsen.

## I.   Claims Against Hartnett and Rodriguez as Supervisors

In Counts Four and Six, Baltas asserts that Captain Hartnett and Lieutenant Rodriguez are liable for deliberate indifference to his safety and for failing to supervise subordinate staff. In *Tangreti v. Bachmann*, the Second Circuit clarified the pleading standard applicable to supervisory defendants in cases concerning alleged violations of constitutional rights. Joining other Courts of Appeals that have addressed the issue, the Second Circuit held that "after *Iqbal*, there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' ... The violation must be established against the supervisory official *directly*." *Tangreti*, 983 F.3d 609, 618 (2d Cir. 2020) (emphasis added) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). To the extent Baltas asserts claims against supervisory officials, he must allege facts reflecting that a defendant had direct personal involvement in the violation. The Court has already held that Baltas may proceed against Lieutenant Rodriguez for failure to intervene in the alleged excessive force by the Special Transportation Team (Officers Negron, Dones, and Usluca) and for failing to take steps to ensure Baltas's safety during his transport. Baltas has not alleged facts indicating that Rodriguez had direct involvement in any other constitutional violation.

As for Captain Hartnett, Baltas alleges that Hartnett's investigation determined that Officers Negron, Dones, and Usluca had not engaged in any excessive force and that Hartnett failed to enforce DOC policies. Baltas has not alleged, however, that Hartnett took any action that could be considered excessive force in violation of the Eighth Amendment. Further, a prison official's failure to comply with prison rules does not constitute a basis for relief under Section

1983. *Fine v. UConn Med.*, No. 3:18-CV-530 (JAM), 2019 WL 236726, at *9 (D. Conn. Jan. 16, 2019) ("a prison official's violation of a prison regulation or policy does not establish that the official has violated the Constitution or is liable to a prisoner under 42 U.S.C. § 1983.") (citation omitted).

Baltas has alleged that "the incident and results" were disseminated "department wide" and that he suffered numerous abuses at the hands of correction staff who knew they could act with impunity against him. Compl. at ¶¶ 124-126. Baltas's allegations that reports about Baltas's assault and Hartnett's investigation caused him to suffer abuses from correctional staff is conclusory and cannot suffice to suggest Hartnett's direct involvement in a constitutional violation. *See Darby v. Greenman*, 14 F.4th 124, 131 (2d Cir. 2021). Furthermore, Baltas has not alleged facts showing that Hartnett acted to disseminate this information and was conscious that it would expose Baltas to correctional staff abuse in the future. Accordingly, Baltas has not alleged any plausible constitutional violation under section 1983 against Captain Hartnett.

### J.      Official Capacity

Baltas requests a court referral to both the State's Attorney Office and the U.S. Attorney's Office for an investigation and action on any alleged wrongdoing or corruption; he also seeks the Court to enjoin or order an independent body or to have the Office of Ombudsman be reinstated to act upon the Defendants' alleged wrongdoing and corrupt acts. Compl. at ¶ K. The Court construes these requests as official capacity claims seeking injunctive orders.

Under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), "a plaintiff may sue a state official acting in his official capacity -- notwithstanding the Eleventh Amendment -- for 'prospective injunctive relief' from violations of federal law." *In re Deposit Ins. Agency*, 482

F.3d 612, 617 (2d Cir. 2007); *see also Vega v. Semple*, 963 F.3d 259, 281 (2d Cir. 2020) ("[S]uits for prospective relief against an individual acting in his official capacity may be brought to end an ongoing violation of a federal law."). A claim for injunctive relief against a defendant in his or her official capacity may proceed only to the extent that the defendant has the authority to remedy the alleged ongoing constitutional violation. *See Scozzari v. Santiago*, No. 3:19CV00229(JAM), 2019 WL 1921858, at *6 (D. Conn. Apr. 29, 2019) (permitting plaintiff's claims for injunctive relief to proceed against certain defendants "insofar as they have the power to remedy what he alleges to be his unconstitutional placement in administrative segregation[ ]"). Here, Baltas has not alleged an ongoing constitutional violation to be remedied by Baltas's requests.

Furthermore, Baltas has no "constitutional right to an investigation of any kind by government officials[,]" *Banks v. Annucci*, 48 F. Supp. 3d 394, 414 (N.D.N.Y. 2014) (citations omitted); s*ee also Leeke v. Timmerman*, 454 U.S. 83, 87 (1981) (inmates alleging beating by prison guards lack standing to challenge prison officials' request to magistrate not to issue arrest warrants); *Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("in American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another"); *Joyce v. Hanney*, No. 3:05cv1477 (WWE), 2009 WL 563633, at *9 (D. Conn. Mar. 4, 2009) (prisoner has no constitutional right to have defendants disciplined or prosecuted). Accordingly, Baltas's requests for official capacity relief are dismissed as not plausible.

**K.      State Law Claims**

This Court can exercise supplemental jurisdiction over a state law claim if:

(1) there is a claim arising under the federal constitution or federal laws; (2) the relationship

between the federal claim and the state claim permits the conclusion that the entire action comprises but one constitutional case; (3) the federal claim has substance sufficient to confer subject matter jurisdiction on the court; and (4) the state and federal claims derive from a common nucleus of operative fact. *Miller v. Lovett*, 879 F.2d 1066, 1071 (2d Cir. 1989), abrogated on other grounds*, Graham v. Connor*, 490 U.S. 386 (1989); *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966). Thus, the Court will not exercise supplemental jurisdiction over Baltas's claim of slander because it does not derive from the same facts as his plausible Eighth and First Amendment claims proceeding in this action, which concern the alleged treatment and conditions inflicted by Defendants Dones, Negron, Usluca, Savoie, Olsen, and Rodriguez.

Baltas's state law claims of assault and battery, negligence and Connecticut constitutional violations do, however, derive from the same factual predicate as his plausible Eighth and First Amendment claims. Accordingly, the Court will consider whether Baltas has alleged any plausible claims under state law for assault and battery, negligence, and violations of the Connecticut Constitution that do not raise a novel and complex issue of state law. *See* 28 U.S.C. § 1367(c)(1) ("The district courts may decline to exercise supplemental jurisdiction over a claim" that "raised a novel or complex issue of State Law....").[10]

### 1.    Assault and Battery

Under Connecticut law, "liability for battery arises if (a) a person acts intending to cause a harmful or offensive contact with the person of the other or a third person ... and (b) a harmful contact with the person of the other directly or indirectly results." *Simms v. Chaisson*, 277 Conn.

---

[10] Any official capacity claims under state law are barred under the Eleventh Amendment. *See Vega v. Semple*, 963 F.3d 259, 284 (2d Cir. 2020).

319, 331 (2006) (citing Restatement (Second), Torts § 13 (1965)). "Liability for assault arises if (a) a person acts intending to cause a harmful or offensive contact with the person of the other ... and (b) the other is thereby put in such imminent apprehension." *Id.* To "constitute an actionable assault and battery there must have been an unlawful force applied to one person by another." *Moriarty v. Lippe*, 162 Conn. 371, 389 (1972). A defendant may also be liable for aiding and abetting with an assault and battery. *See Master–Halco, Inc. v. Scillia, Dowling & Natarelli, LLC,* 739 F. Supp. 2d 109, 121 (D. Conn. 2010) ("what must be proven for aider-abettor liability is that the individual gave substantial assistance to the tortfeasor in carrying out the tort with the knowledge—or reckless indifference to the possibility—that the assistance would aid in carrying out that tort").

Baltas has plausibly alleged the elements of assault and battery against Correction Officers Dones, Negron, Usluca, who allegedly subjected Balta to excessive force, and against Officer Savoie, who allegedly threw objects at Baltas. He may also proceed against Lieutenant Rodriguez under a theory of aiding and abetting liability.

### 2.    Negligence

Any negligence claims against defendants in their individual capacities are barred by Connecticut General Statute § 4–165, which provides: "No state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his or her duties or within the scope of his or her employment." "[W]anton, reckless, or malicious" acts go beyond gross negligence, and denote "highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent." *Martin v. Brady*, 261 Conn. 372, 379, 802 A.2d 814, 819 (2002) (internal quotation

marks and citation omitted). Thus, Baltas cannot hold the defendants, who are state employees, "personally liable for their negligent actions performed within the scope of their employment." *Miller v. Egan*, 265 Conn. 301, 319 (2003).

Accordingly, the negligence claims against the individual Defendants are dismissed as not plausible.

Baltas also asserts a claim for damages against the State of Connecticut under Connecticut General Statute § 52-556, which provides:

> Any person injured in person or property through the negligence of any state official or employee when operating a motor vehicle owned and insured by the state against personal injuries or property damage shall have a right of action against the state to recover damages for such injury.

Section 52-556 affords a cause of action for damages, but it does not specify whether the state has consented to suit under section 52-556 filed in federal court. Under the Eleventh Amendment, an unconsenting state and its state officials sued in their official capacity are immune from suits for damages brought in federal courts. *See Edelman v. Jordan,* 415 U.S. 651, 663 (1974). In the absence of a state's consent, a suit in federal court in which a state or one of its agencies or departments is named as the defendant for damages is proscribed by the Eleventh Amendment. *See Florida Dept. of Health and Rehabilitative Services v. Florida Nursing Home Assn.,* 450 U.S. 147, 149 (1981). A state may waive its Eleventh Amendment immunity so long as the waiver is unequivocally expressed. *See Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 241 (1985)  ("The test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one. Although a State's general waiver of sovereign immunity may subject it to suit in state court, it is not enough to waive the immunity guaranteed by the Eleventh Amendment .... In the absence of an unequivocal waiver specifically applicable to

38

federal-court jurisdiction, we decline to find that [a state] has waived its constitutional

immunity."). The court may not find an Eleventh Amendment waiver "unless the state has

spoken in the 'most express language or by such overwhelming implications from the text as

[will] leave no room for any other reasonable construction.'" *Minotti v. Lensink*, 798 F.2d 607,

610 (2d Cir. 1986) (quoting *Edelman,* 415 U.S. at 673) (other citation omitted); *see also*

*Atascadero State Hosp*, 473 U.S. at 240. "Since '[a] State's constitutional interest in immunity

encompasses not merely *whether* it may be sued, but *where* it may be sued,' there will be no

waiver of immunity against federal suit unless the state specifies its intention to consent to suit in

federal court." *Minotti*, 798 F.2d at 610 (citation omitted).

Here, section 52-556 contains no express language or any overwhelming implication

from the statutory text that the State of Connecticut has waived its Eleventh Amendment

immunity and thereby consents to be sued for damages under section 52-556 in federal court.

Nor does any Connecticut Supreme Court decision clarify that the statute may be construed to

constitute a waiver of the State's Eleventh Amendment immunity. *See Minotti*, 789 F.2d at 611

("the silence of the legislature may be rectified by the voice of the state's highest court."). In fact,

the Connecticut Supreme Court has directed that statutory waivers of sovereign immunity should

be construed to afford the "least rather than the most change in sovereign immunity," *Babes v.*

*Bennett*, 247 Conn. 256, 262 (1998), and the Court has previously afforded narrow construction

to the scope of section 52-556's waiver of sovereign immunity in the absence clear language. *See*

*Hicks v. State*, 297 Conn. 798, 802–03 (2010) ("However, the absence of *any* reference in § 52–

556 to postjudgment interest, particularly in light of the narrow construction we accord to

waivers of sovereign immunity, suggests that the only reasonable interpretation of § 52–556 is

that the legislature did not, by waiving immunity from liability for damages, intend to waive immunity with respect to postjudgment interest.).

Thus, at present, it remains unclear as to whether Connecticut has waived its Eleventh Amendment immunity and thereby consents to suits for damages under section 52-556 in federal court. Because Baltas's section 52-556 claim raises a novel issue of state law, the Court declines to exercise supplemental jurisdiction over the claim under § 1367(c)(1) ("The district courts may decline to exercise supplemental jurisdiction over a claim" that "raises a novel or complex issue of State Law....").

### 3.    Connecticut Constitutional Violations

The Connecticut Supreme Court recognized a private cause of action for monetary damages under Article I, sections 7 and 9 of the Connecticut Constitution where the claims arose out of unreasonable searches and seizures and unlawful arrest by police officers. *Binette v. Sabo*, 244 Conn. 23, 47-49 (1998). In reaching its decision, the Connecticut Supreme Court "emphasize[d] that [its] decision to recognize a *Bivens*-type remedy in this case does not mean that a constitutional cause of action exists for every violation of our state constitution." *Id.* at 47.

Although the Connecticut Supreme Court created a cause of action under Article First, sections 7[11] and 9[12] for a *Bivens*-type claim, it has not applied section 7 or 9 in the context of a case filed by an inmate or a detainee involving claims relating to excessive force by correctional

---

[11] Article First, Section 7 provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[12] Article First, Section 9 provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

staff or prison conditions of confinement. Therefore, the court declines to exercise supplemental jurisdiction over Plaintiff's claims asserted pursuant to Article First, sections 7 or 9 of the Connecticut Constitution. *See Woolard v. Santiago*, No. 3:19CV1256 (VLB), 2020 WL 2079533, at *11 (D. Conn. Apr. 30, 2020) (declining jurisdiction for claims concerning inmate's confinement under section 9); *see also Torres v. Armstrong*, No. CV990427057S, 2001 WL 1178581, at *1, 6-7 & n.6 (Conn. Super. Ct. Sept. 6, 2001) (narrowly construing *Binette* in a civil action asserting claims of violations of an inmate's rights under the United States and Connecticut Constitutions, including claims of "cruel and unusual punishment under the federal constitution" and a claim of a deprivation "of his rights under ... article first, § 9" of the state constitution, and "declin[ing] to recognize [a] damages action[ ] under the Connecticut and United States constitutions under the circumstances of th[e] case").

Court decisions have also routinely declined to recognize a private right of action under Article First, sections 1,[13] 4,[14] 8,[15] 10,[16] 14,[17] and 20[18] of the Connecticut Constitution.

---

[13] Article First, Section 1 provides: "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community."

[14] Article First, Section 4 provides: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."

[15] Article First, Section 8 provides in pertinent part: "No person shall be ... deprived of life, liberty or property with due process of law...."

[16] Article First, Section 10 provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

[17] Article First, Section 14 provides: "The citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance."

[18] Article First, Section 20 provides: "No person shall be denied equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political

*See St. Louis v. Wu*, No. 3:19-cv-320 (KAD), 2019 WL 2357566, at *7 (D. Conn. June 4, 2019) (Connecticut courts have repeatedly declined to recognize private right of action under Article first, §§ 1 and 20 of Connecticut Constitution) (citing cases); *Richard v. Strom*, No. 3:18-CV-1451 (CSH), 2018 WL 6050898, at *8 (D. Conn. Nov. 19, 2018) (concluding "[t]here is no established private right of action under the religious discrimination, due process, or equal protection provisions (Article First, Sections 3, 8, and 20)"); *Minto v. Dep't of Mental Health & Addiction Servs.*, No. HHDCV176076730S, 2018 WL 710124, at *9 (Conn. Super. Ct. Jan. 11, 2018) ("Connecticut courts have unanimously declined to recognize a private cause of action under article first, § 20"); *Doe v. Crowley v. Town of Enfield*, No. 3:14 cv 01903 (MPS), 2015 WL 4162435, at *3 (D. Conn. July 9, 2015) (declining to recognize a private right of action under Article First, Sections 8 and 20); *Lopez v. Smiley*, 375 F. Supp. 2d 19, 23-26 (D. Conn. 2005) (declining to exercise supplemental jurisdiction over novel, complex and undeveloped claims under Article First, Sections 4, 5, 7, 8, 9, 10 and 14).

Thus, the Court concludes that it is inappropriate to exercise supplemental jurisdiction over these claims brought under the Connecticut constitution that raise new and undeveloped issues under state law. *See* 28 U.S.C. § 1367(c)(1) ("The district courts may decline to exercise supplemental jurisdiction over a claim" that "raised a novel or complex issue of State Law...."). Accordingly, the court must dismiss these claims without prejudice.

### L.    Motions for Prejudgment Remedy and Disclosure of Assets

Baltas seeks a prejudgment remedy and disclosure of assets against Defendants Negron, Dones, Usluca, Rodriguez, and the State of Connecticut. *See* ECF Nos. 4 & 5.

---

rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability."

Rule 64(a) of the Federal Rules of Civil Procedure provides in pertinent part that "[a]t the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." The procedure for obtaining a prejudgment remedy is governed by state law. *See Bahrain Telecomm. Co. v. DiscoveryTel, Inc.*, 476 F. Supp. 2d 176, 183 (D. Conn. 2007); *see also Everspeed Enterprises Ltd. v. Skaarup Shipping Int'l.*, 754 F. Supp. 2d 395, 401 (D. Conn. 2010) ("Rule 64 of the Federal Rules of Civil Procedure permits a plaintiff to utilize the state prejudgment remedies available to secure a judgment that might ultimately be rendered in an action.").

"Under Connecticut law, a prejudgment remedy is appropriate if the court, 'upon consideration of the facts before it and taking into account any defenses, counterclaims or setoffs ... finds that the plaintiff has shown probable cause that such a judgment will be rendered in the matter in the plaintiff's favor in the amount of the prejudgment remedy sought[.]'" *Roberts v. TriPlanet Partners, LLC*, 950 F. Supp. 2d 418, 420 (D. Conn. 2013) (quoting Conn. Gen. Stat. § 52-278d(a)). Thus, "[a] prejudgment remedy may be obtained when the plaintiff establishes that there is probable cause to sustain the validity of his claims." *Davila v. Secure Pharmacy Plus*, 329 F. Supp. 2d 311, 313 (D. Conn. 2004) (citing Conn. Gen. Stat. § 52-278d).[19] Such a remedy

---

[19] Section 52-278b of the Connecticut General Statutes provides that "no prejudgment remedy shall be available to a person in any action at law or equity (1) unless he has complied with the provisions of sections 52-278a to 52-278g[.]" Conn. Gen. Stat. § 52-278b. Section 52-278c sets forth the required documents that must be filed in connection with an application for a prejudgment remedy, and the required notice that must be served upon a defendant. Conn. Gen. Stat. § 52-278c. Except in instances inapplicable here, an application for a prejudgment remedy must be accompanied by an "affidavit sworn to by the plaintiff or any competent affiant setting forth a statement of facts sufficient to show that there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought[.]" Conn. Gen. Stat. § 52-278c(a)(2). The application must also include order and summons forms. Conn. Gen. Stat. § 52-278c(a)(3) & (4) and (b). Further,

is available only if a plaintiff shows probable cause to conclude that judgment will be rendered in his favor. *See Roberts v. TriPlanet Partners, LLC*, 950 F. Supp. 2d 418, 420 (D. Conn. 2013) (quoting Conn. Gen. Stat. § 52-278d(a)). Baltas has submitted an affidavit in support of his motion for prejudgment remedy [ECF No. 4-1] that essentially asserts his complaint's allegations against Defendants Negron, Dones, Usluca, and Rodriguez. Although Baltas has alleged plausible Eighth Amendment claims against Officers Dones, Negron and Usluca and Lieutenant Rodriguez, his complaint's allegations fall short of establishing probable cause to conclude that his claims will succeed. Accordingly, the Court will deny without prejudice his request for prejudgment remedy absent a more substantial showing of his likelihood of success.

## ORDERS

The Court enters the following orders.

(1) Consistent with the foregoing, the case shall proceed on Baltas's Eighth Amendment excessive force claims against Officers Dones, Negron, and Usluca and Lieutenant Rodriguez in their individual capacities; on his Eighth Amendment deliberate indifference to health and safety claims against Officers Dones, Negron, and Usluca and Lieutenant Rodriguez in their individual capacities; on his Eighth Amendment deliberate indifference claims to health and safety against Officers Savoie and Olsen in their individual capacities; on his First Amendment retaliation claims against Officers Dones, Savoie and Olsen in their individual capacities; and on his assault and battery claims against Officers Dones, Negron, Usluca, and Savoie and Lieutenant Rodriguez in their individual capacities.

---

section 52-278c "requires that a notice and claim form containing specific language be attached to the application for prejudgment remedy." *Davila*, 329 F. Supp. 2d at 314 (citing Conn. Gen. Stat. § 52-278c(e), (f), and (g)).

Baltas's motions for prejudgment remedy and prejudgment disclosure are DENIED without prejudice. ECF No. 4; ECF No. 5.

The Court declines to exercise supplemental jurisdiction over Baltas's state law claims of slander and violations of Article First of the Connecticut Constitution. These claims are DISMISSED without prejudice. All other federal claims, including official capacity claims, and all other state law claims are DISMISSED without prejudice. Defendants Hartnett and ASA Russo are DISMISSED without prejudice from this action.

 (2) The Clerk shall verify the current work address of Transportation Officers Alexandro Dones, Gervacio Negron and Yavuz Usluca, Lieutenant William Rodriguez, Correction Officer David Savoie, and Correction Officer Olsen with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the complaint [ECF No. 1] to them at their confirmed addresses within twenty-one (21) days of this Order, and report on the status of the waiver request on the thirty-fifth (35th) day after mailing. If a defendant fails to return the waiver request, the clerk shall make arrangements for in-person individual capacity service by the U.S. Marshals Service on that defendant, and the defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(4) The clerk shall send a courtesy copy of the Complaint [ECF No. 1] and this Order to the DOC Office of Legal Affairs and to the Connecticut Attorney General.

(5) Should the plaintiff wish to amend his complaint, he may file a motion for leave to amend within thirty (30) days from the date of this order.   The Court will not allow further amendments after that date.

(6) The defendants shall file a response to the complaint, either an answer or motion to

dismiss, within sixty (60) days from the date the notice of lawsuit and waiver of service of summons forms are mailed to them. If the defendants choose to file an answer, defendants shall admit or deny the allegations and respond to the cognizable claims recited above. The defendants may also include any and all additional defenses permitted by the Federal Rules.

(7) Discovery, according to Federal Rules of Civil Procedure 26-37, shall be completed within six months (180 days) from the date of this Order. Discovery requests need not be filed with the Court.

 (8) The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures," which will be sent to both parties by the Court. The Order can also be found at http://ctd.uscourts.gov/administrative-standing-orders.

(9) All motions for summary judgment shall be filed within seven months (210 days) from the date of this Order.

(10) According to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within twenty-one (21) days of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(11) If the plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the Court. Failure to do so can result in the dismissal of the case. The plaintiff must give notice of a new address even if he is incarcerated. He should write "PLEASE NOTE MY NEW ADDRESS" on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If the plaintiff has more than one pending case, he should indicate all of the case numbers in the notification of change of address. He should also notify the defendants or defense counsel of his

46

new address.

      (12) The plaintiff shall utilize the Prisoner Efiling Program when filing documents with the court. The plaintiff is advised that the Program may be used only to file documents with the court. Local court rules provide that discovery requests are not filed with the court. D. Conn. L. Civ. R. 5(f). Therefore, discovery requests must be served on defendants' counsel by regular mail.

      SO ORDERED at Hartford, Connecticut this 27th day of April, 2022.

                  /s/

                Michael P. Shea
                United States District Judge